IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JIMMY LEE PARSONS,

        Plaintiff,

        v.                      Civil Action No. 1:09-CV-166

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Jimmy Parsons (Claimant), filed a Complaint on December 15, 2009 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on March

4, 2010.[2]  Claimant filed his Motion for Judgment on the Pleadings on April 3, 2010.[3]

Commissioner filed his Motion for Summary Judgment on April 30, 2010.[4]

B.    <u>The Pleadings</u>

    1.    <u>Plaintiff's Brief in Support of Motion for Judgment on the Pleadings</u>.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 11.

[4] Docket No. 12.

2.     Defendant's Brief in Support of Motion for Summary Judgment.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err in relying on the VE's testimony, did not violate SSR 00-4p, and properly formed the RFC including Claimant's limitations. .

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II.  Facts

A.     Procedural History

Claimant filed his second and current application for Supplemental Security Income (SSI) on June 20, 2006, alleging disability since June 1, 2003, due to pain in his right shoulder, back pain, and pain in his legs.  (Tr. 113, 147-50).  The claim was denied initially on November 13, 2006, and upon reconsideration on February 22, 2007.  (Tr. 62-64, 70-72).  Claimant filed a written request for a hearing on March 6, 2007.  (Tr. 73).  Claimant's request was granted and a hearing was held on April 30, 2009.  (Tr. 79, 19-55).

The ALJ issued an unfavorable decision on May 15, 2009.  (Tr. 7-18).  The ALJ determined Claimant was not disabled under the Act because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 C.F.R. §§ 416.969, 416.969a).  (Tr. 14-17).  On May 26, 2009, Claimant filed a request for

review of that determination.  (Tr. 6).  The request for review was denied by the Appeals Council

on October 14, 2009.  (Tr. 1-5).  Therefore, on October 14, 2009, the ALJ's decision became the

final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this

Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on October 15, 1978, and was twenty-four (24) years old as of the

onset date of his alleged disability and thirty (30) as of the date of the ALJ's decision.  (Tr. 113).

Claimant was therefore considered a "younger person," under the age of 50 and, generally,

whose age will not seriously affect the ability to adjust to other work, under the Commissioner's

regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2010).  Claimant received his GED and has

past relevant experience as a general laborer and telemarketer and performing lawn care.  (Tr.

26, 27, 178).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence

supports the ALJ's determination that Claimant's subjective complaints were not entirely

credible:

**Treatment Records, Dr. Seen, Roane General Hospital, 1/2/01 - 11/5/03 (Tr. 219-20 & 302-11)**
1/2/01 ER Record
- assessment: AC separation right arm; right shoulder pain; S/P trauma with impingement sign;
rule out rotator cuff tear
- plan: Darvocet; follow-up with family doctor tomorrow
- special instructions: follow-up with family doctor; use sling; rest shoulder, elevate, apply ice
packs
1/2/01 X-ray
- views of right shoulder do not demonstrate evidence of an acute fracture or dislocation

3

- impression: no acute fracture
- views of dorsal spine do not demonstrate evidence of an acute fracture; slight scoliosis suggested in AP projection
- impression: no acute fracture

<u>1/12/01 MRI Report</u>
- history: pain, swelling after fall on right scapula; history of acromioclavicular injury
- right shoulder MRI
- impression: increased signal around AC joint consistent with edema and hemorrhage; rotator cuff, as well as supraspinatus tendon, appear intact

<u>2/1/01</u>
- subjective: follow-up on right shoulder; wearing a sling but wants to take it off because it's making the arm hurt worse
- objective: well developed; full ROM of shoulders but with pain and with palpation of right AC joint; no other areas of tenderness noted
- assessment: right AC strain not responding to conservative measures
- plan: begin gentle biceps/triceps strengthening

<u>11/5/03 MRI Report</u>
- indication: low back pain and paresthesias
- impression: probable limbus vertebra at L3; no other significant or focal abnormality seen


**<u>Treatment Notes, Dr. Soulsby, Orthoclinic, 1/19/01 - 3/12/02 (Tr. 221-35)</u>**
<u>1/19/01</u>
- chief complaint: right shoulder pain
- assessment: AC joint separation
- exam: crepitance in right shoulder; some AC joint tenderness; tenderness along humeral head; pain with 90 degrees of abduction; 100 degrees of forward flexion; good strength with resistance; sensation is intact
- plan: given injection; keep shoulder immobilized; return in 2 weeks for further evaluation and repeat x-rays

<u>2/6/01</u>
- chief complaint: injection from last visit lasted only 3 hours; difficulty using right upper extremity
- exam: swelling over AC joint; tenderness to palpation; crepitance with shoulder motion; 75 degrees forward flexion; 45 degrees abduction; 30 degrees external rotation; 30 degrees internal rotation; all motion is within significant irritability and crepitance at the AC joint
- assessment: status post AC separation
- plan: recommend AC joint reconstruction

<u>3/19/01</u>
- preoperative diagnosis: chronic acromioclavicular dislocation right shoulder
- postoperative diagnosis: chronic acromioclavicular dislocation right shoulder

<u>3/30/01</u>
- follow-up post AC reconstruction
- lots of discomfort
- use immobilizer and keep arm at rest

<u>4/17/01</u>
- right shoulder x-ray
- overall alignment to be acceptable with minimal subluxation
<u>4/17/01</u>
- follow-up AC reconstruction of the shoulder
- doing better; pain is somewhat improved
- plan: avoid significant strain on shoulder; work on ROM but no strenuous activity
<u>6/5/01</u>
- follow-up right shoulder
- reports good deal of pain; complaints of active motion
- exam: tenderness to palpation over distal clavicle; ROM of shoulder is nearly full; stiffness is present; subjective irritability
- assessment: status post, excision right distal clavicle with AC reconstruction
- plan: active assisted ROM for next 2 weeks then ROM and strengthening and therapy for next 6 weeks; take Darvocet
<u>6/5/01</u>
- MRI right shoulder
- interpretation: status post AC reconstruction with excision of distal clavicle; no complicating features are noted; overall alignment looks good
<u>8/7/01</u>
- follow-up right shoulder
- still having pain
- exam: prominent distal clavicle; some tenderness to palpation over AC joint; ROM of shoulder is improving but not full; 110 degrees of forward flexion; 95 degrees of abduction; 30 degrees of external rotation; 40 degrees of internal rotation; irritability at ends of motion
- assessment: status post, right AC joint reconstruction
- plan: PT
<u>8/7/01</u>
- right shoulder x-ray
- assessment: normal shoulder x-ray
<u>12/4/01</u>
- follow-up right shoulder AC reconstruction
- subjective: not having an awful amount of pain
- exam: AC joint is probably a CM subluxed but is not very tender; aggravation when overhead abduction, flexion, and cross arm test; some tenderness along trapezius and at base of cervical spine without visible atrophy; trapezius and lamboid function is intact but appears to be weak; has occasional numbness in hand; greatly improved from original injury
- plan: continue with home exercise program
<u>12/4/01</u>
- shoulder x-ray
- interpretation: looks fine; overall alignment good; does not appear to subluxed
<u>3/12/02</u>
- shoulder x-ray
- assessment: status post excision distal clavicle

- interpretation: post operative changes of distal clavicle excision; otherwise should appears normal; no joint space narrowing or sclerosis; no subluxation is evidence; soft tissue shadows are normal; no destructive process noted; no fractures or dislocations seen; no significant osteophyte off acromion

**Treatment Notes, Dr. Rajasekhariahiah, 3/15/01 - 8/16/03 (Tr. 254-61)**
3/15/01
- physical exam: well built and nourished
- assessment: chronic AC separation on RT side
- plan: strongly advised smoking cessation
8/16/03
- subjective: pain and stiffness in right shoulder; had surgery; has follow-up x-rays and has had physical therapy; used a TENS unit twice/day though he was advised to use it four times/day; pain gradually gotten worse
- physical exam: exam of shoulder reveals bony prominence likely the acromion; some tenderness all over shoulder joint and limited range of abduction to about 90 degrees; some tenderness of lower trapezius as well as parascapular areas
- assessment: right shoulder pain with history of chronic AC separation status post surgery
- x-ray impression: post-traumatic osteolysis of right distal clavicle with subluxation of AC joint; no acute process seen

**Treatment Notes, Minnie Hamilton Clinic, 3/15/01 - 2/18/08 (Tr. 358-87)**
8/16/03
- chief complaint: pain and stiffness in right shoulder and upper arm up to neck
- assessment: right shoulder strain
- plan: medications
8/19/03
- chief complaint: put on new medications - rash
- assessment: right shoulder pain secondary to overuse; bursitis
- plan: start illegible; PT referral
8/22/03
- chief complaint: follow-up on right shoulder
- assessment: right shoulder pain; bursitis
- plan: continue PT
8/29/03
- chief complaint: follow-up PT AC separation right shoulder
- assessment: right shoulder pain; illegible
- plan: may return to work
9/10/03
- chief complaint: back pain; right shoulder side separation; currently in therapy for shoulder
- assessment: thoracic lumbar muscle strain secondary to overuse
- plan: no work for two days; illegible
9/23/03
- chief complaint: follow-up back pain

- assessment: thoracic lumbar strain improved
- plan: continue PT; consider MRI of L-5 spine
10/22/03
- chief complaint: follow-up for back pain
- assessment: thoracic lumbar strain
- plan: continue PT; MRI lumbar spine
3/16/04
- chief complaint: increase stress and anxiety; can't afford medication
- assessment: anxiety
3/18/06
- chief complaint: wound steri-strip
- assessment: illegible
- plan: follow-up
4/7/06
- chief complaint: ER follow-up
- assessment: sinusitis
7/20/07
- chief complaint: pain decrease in back and legs
- assessment: lumbar strain
- plan: motrin
9/10/07
- chief complaint: wrecked motorcycle 2 days ago; right shoulder pain
- assessment: right shoulder strain
- plan: PT consult; medications
2/18/08
- chief complaint: fever, chills, body aches
- assessment: flu


**Treatment Records, Minnie Hamilton Physical Therapy, 5/9/01 - 10/22/03 (Tr. 262-301)**
4/17/01
- prescription for physical therapy
- diagnosis: s/p AC JT reconstruction on right shoulder
- 3 times/week for 4 weeks
5/9/01
- initial evaluation
- diagnosis: AC reconstruction complete
- objective: R scapular winging, well closed and healed incision; mild scapular
5/11/01
- subjective: illegible
- objective: ROM exercises
5/14/01
- subjective: a lot more loose today; dull ache still but not as severe
- assessment: elevated clavicle today in resting position
5/16/01

- subjective: little sore after last treatment
- assessment: elevated clavicle today
5/21/01
- subjective: been doing exercises at home and using ice; little sore today
5/23/01
- subjective: no pain lifting arm over head
- assessment: ROM improved
5/25/01
- subjective: can rotate arm now
- assessment: improved ROM
5/29/01: no show
5/30/01: no show
6/1/01: no show
6/20/01: discharge summary
- reasons for discharge: patient understood home instructions and stopped coming to clinic
- potential for further improvement: patient did not reach maximum rehabilitation; potential for continued improvement is good
8/23/01: initial evaluation
- diagnosis: right clavicle surgery
8/27/01: no show
8/29/01:
- subjective: hurts at end of bone; new pressure downward
- assessment/plan: continue PT
8/31/01: patient called and cancelled
9/4/01: no show
9/10/01
- subjective: no pain now
- assessment/plan: continue PT
9/12/01
- subjective: no new pain
- assessment: increased reps of exercises
- plan: continue
9/14/01:  cancelled
9/17/01: no show
9/19/01: no show
9/21/01: no show
10/3/01: no show
10/3/01: discharge summary
- reason for discharge: patient understood home instructions; patient did not return after 9/12
- potential for improvement: did not reach maximum potential for improvement; potential for continued improvement is fair
8/20/03: outpatient physical therapy extremity evaluation
- medical diagnosis: right shoulder pain
- assessment: muscular dysfunction right shoulder; severe guarding causing myofascial

dysfunction; should do well if get (illegible) back to normal; unable to determine more at this time; right shoulder joint good
- plan: 2-3x/week for 4 weeks; moist heat; E-stim to Latissimus ; Medial scapular border; soft tissue myofascial mobilization; ROM - strengthen program
12/1/03: discharge summary
- reasons for discharge: patient did not return; financial concerns
- comments: demonstrated moderate improvement

**Emergency Department Records, Minnie Hamilton Health Care Center, 8/22/01 - 1/1/09 (Tr. 388-72)**
8/22/01
- chief complaint: SOB; having trouble breathing
- diagnosis: COPD
- left hospital against advice - risks: increasing shortness of breath; status asthmaticus; respiratory failure; hypoxia and related complications
8/23/01 x-ray
- chest
- clinical history: dyspnea
- impression: mild discoid atelectasis
12/6/01
- chief complaint: fell and landed on right shoulder
- diagnosis: right shoulder strain
- plan: sling; no heavy lifting
12/6/01 x-ray
- lumbar spine AP and lateral
    - impression: no evidence of acute fracture or significant disc space narrowing; limbus vertebrae involving the L3 vertebral body anteriorly and superiorly which is a common congenital anomaly
- CT lumbar spine
    - clinical history: fall with abnormality noted on plain films
    - impression: irregularity involving anterior superior margin of L3 consistent with a limbus vertebrae which is a benign congenital anomaly; no evidence of acute fracture
- acromioclavicular joints/right shoulder
    - impression: postoperative changes involving right shoulder following previous partial resection of distal clavicle; associated with some bone resorption; no evidence of acute fracture or AC separation
3/23/04
- chief complaint: wrecked 4-wheeler; right hand and wrist pain
- clinical impression: right wrist/hand contusion
- disposition: discharged
3/23/04 x-ray reports
- three views right wrist
    - impression: normal right wrist
4/20/04

- chief complaint: pain in both eyes
- physical exam: normal eyelids; EOMs intact; pupils normal; anterior chambers normal
- clinical impression: acute eye pain; ultraviolet keratitis

5/27/04
- chief complaint: fever, dizziness started in morning
- physical exam: normal
- disposition: discharged with written instructions
- clinical impression: pharyngitis - acute

3/13/06
- chief complaint: hit head on dresser causing laceration; had been drinking alcohol and fell when moving dresser; headache
- CT scan: normal
- clinical impression: contusion; head hematoma; back abrasion
- discharged

3/13/06 x-ray
- facial bones x-ray
- indications: laceration on forehead/nose hurts
- impression: extensive diffuse sinusitis especially involving bilateral maxillary sinus; no distinct fracture seen

10/1/07
- chief complaint: superglue squirted in his eye
- disposition: improved; stable - home

8/25/07
- chief complaint: low back pain after playing football with children
- clinical impression: LBP/strain
- disposition: stable; discharged
- discharge instructions: no heavy lifting or pulling for 48 hours; heat 4 times/day for 20 minutes; take medications

1/1/09
- chief complaint: injury to right shoulder, neck, hip; fell in ravine searching for missing person
- initial assessment: alert; non-tender extremities; non-tender, non-injured neck/back; oriented x3; moving all extremities with weakness in right shoulder, knee
- clinical impression: back, right shoulder, and right hip contusions; neck sprain
- condition: improved; stable; medication reconciled
- disposition: discharged

1/1/09 diagnostic imaging result
- CT cervical spine without IV contrast
    - impression: no gross evidence of fracture; if patient remains symptomatic, consider full evaluation including multiplanar reconstruction; no gross fracture; normal AP and lateral views of cervical spine
- single view of chest
    - reason: fall; pain
    - impression: normal AP upright chest
- three views right shoulder

- reason: fall; pain; LIM ROM; winged scapula
    - impression: normal examination of right shoulder
- single AP view of pelvis
    - reason: fall; pain
    - impression: normal view of pelvis
- two views of right hip
    - reason: fall; pain
    - impression: normal examination of right hip


**Disability Determination Evaluation, Dr. Morales, 3/15/02 (Tr. 236-47)**
- diagnostic impression: acromioclavicular separation, postoperative state with slight dysfunction of right shoulder; nicotine abuse; history of positive H-pylori; history of anxiety; no reflex abnormalities; muscle strength of upper and lower extremities appears to be 5/5; few ROM deficits in right shoulder joint - flexion and extension of right shoulder were reduced by about 30%, abduction of right shoulder reduced by about 50%; adduction is normal and rotation is normal
- summary: general and physical examination is essentially normal; no evidence of chronic obstructive lung disease; continues to smoke ½ pack cigarettes daily


**Physical Residual Functional Capacity Assessment, Dr. Brown, 3/20/02 (Tr. 248-53)**
- primary diagnosis: s/p acromioclavicular arthroplasty Rt.
Exertional Limitations
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited
Postural Limitations: none
Manipulative Limitations:
- reaching all directions (including overhead): limited
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations: none


**Treatment Records, Mark Hewitt PA-C, 8/21/03 - 11/5/03 (Tr. 312-17)**
8/21/03
- subjective: able to move neck and shoulder much better
- assessment: much better today
8/25/03
- subjective: shoulder stiff - was fine until he washed his car this morning
- assessment: subjectively looser post treatment; no complaints or problems and added exercises
8/27/03
- subjective: sore around scapula; no increase in pain

- assessment: larger trigger point in rhomboids
8/29/03
- subjective: shoulder felt pretty good until about 6:00 pm after last treatment then sharp pain and spasm
- assessment: no winging of scapula; no complaints
9/3/03
- subjective: muscles around scapula sore after last visit
- assessment: no complaint or problems; increased reps
9/5/03
- subjective: muscles around scapula feel stronger; felt good after last treatment
- assessment: no complaints or problems except slight muscle fatigue
9/8/03
- subjective: doing pretty good but having a lot of LPB
- assessment: no complaints or problems
9/10/03
- subjective: continued LBP; shoulder feels pretty good
- assessment: exercised held degree pts
9/15/03
- subjective: not been working since last week, so pain is not as bad
- assessment: increase sig; decrease subj c/o "drawing up"
9/17/03
- subjective: went back to work yesterday and had to leave because of pain
- assessment: decreased pain post treatment
9/19/03
- subjective: 2 sore spots - side under arm and in T spine; able to get full range in shoulder and turn head to side
- assessment: tenderness at T spine post treatment; trigger point in latissimus dorsi decreased
9/23/03
- subjective: shoulder feeling a little better but increasing LBP
- plan: institute lumbar stability/flexibility program in addition shoulder rehabilitation
9/25/03
- subjective: shoulder feeling better
9/29/03
- subjective: "aching" all over because of weather
10/1/03
- assessment: no complaints or problems and increased time on bike
10/3/03
- subjective:  shoulder doing very well; back still gets sore but was able to work a full day yesterday
10/6/03
- subjective: back doing pretty well; able to lift at work; pulled shoulder and is a little sore
- assessment: stiffness and soreness in shoulder decreased post treatment; no complaints or problems; continues to improve
10/8/03

- subjective: fell at work yesterday and back is a little sore
- assessment: decreased soreness post treatment
10/10/03
- subjective: back is really sore today because was weed eating all day yesterday at work
- assessment: continued stiffness and soreness post treatment; advised to take it easy over weekend and not use weedeater at work
10/15/03
- subjective: shot a rifle over weekend and it hurt his shoulders and back
- assessment: slight decrease in pain post treatment
10/17/03
- subjective: shoulder is a little better but his lower back is really aggravated
- assessment: no obvious soft tissue dysfunction; probable mechanical instability of left spine
10/22/03
- subjective: back is still bothering him; shoulder doing better
- assessment: no complaints or problems; needed to rest frequently to keep pain free
10/24/03: no show

**Treatment Record, Dr. Gold, 1/13/04 (Tr. 318-20)**
- chief complaint: low back pain described as sharp sensation and occasional sharp shooting pains down anterolateral portion of both legs; pain is associated with numbness and tingling
- physical exam: thoracic and lumbar spine are tender to palpation with decreased range of motion noted in lumbosacral junction; straight leg raise, sciatic tension sign, and Patrick's sign all absent, but do increase patient's back pain; diffuse weakness at 4 to 4+/5 noted in right upper extremity; otherwise strength is normal at 5/5 throughout; reflexes are full at 2/4 and symmetrical throughout

**Consultative Examination Report, Dr. Sabio, 10/21/04 (Tr. 321-28)**
- chief complaints: bronchial asthma, low back pain, right shoulder pain
- social history: smokes ½ pack of cigarettes daily
- review of systems: complains of cough and shortness of breath; history of fainting spells and blackout spells but no convulsions
- physical exam:
    - general: well-developed, well-nourished, alert and oriented, stable at station
    - extremities: tenderness on right shoulder; some stiffness in right shoulder; no redness, swelling, or effusion in any joints in upper and lower extremities besides right shoulder
    - spine: tenderness over spinous processes of lumbar spine and thoracic spine
    - range of motion:
        - cervical: lateral rotation to 80 degrees on left and 15 degrees to right restricted by pain in right shoulder; extension and flexion of cervical spine is within normal limits
        - shoulders: allowed 90 degrees of abduction on right and 70 degrees of forward flexion on right; 180 degrees of abduction and 180 degrees of forward flexion on left; restriction is due to pain and stiffness in right shoulder
        - elbows: 150 degrees bilaterally, extension is 0 degrees bilaterally; supination is

80 degrees bilaterally and pronation is 80 degrees bilaterally
- wrists: dorsiflexion is 60 degrees bilaterally; palmar flexion is 70 degrees bilaterally; radial deviation is 20 degrees bilaterally and ulnar deviation is 30 degrees bilaterally
- hands: 90 degrees of flexion bilaterally and 0 degrees of extension
- straight leg raising: 80 degrees bilaterally restricted by pain in lumbar spine
- lumbar spine: flexion is 70 degrees forward and 10 degrees laterally to either side restricted by pain in lumbar spine
- hips: 100 degrees of flexion and 30 degrees of extension bilaterally
- diagnostic impression: chronic lumbar strain; bronchial asthma; right shoulder pain and stiffness secondary to adhesive capsulitis

**Physical Residual Functional Capacity Assessment, Dr. Lim, 12/8/04 (Tr. 329-36)**
- primary diagnosis: right shoulder
- secondary diagnosis: blackout spells and asthma
Exertional Limitations
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited
Postural Limitations: none
Manipulative Limitations:
- reaching all directions (including overhead): limited
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: avoid concentrated exposure
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
- hazards: avoid concentrated exposure

**Medical Consultant's Review of Physical RFC Assessment, Dr. Sarpolis, 1/16/05 (Tr. 337-38)**
Limitations
- exertional: agree
- postural: agree
- manipulative: agree
- visual: agree
- communicative: agree

- environmental: agree
<u>Symptoms</u>: agree
<u>Treating or Examining Source Statements</u>: agree
<u>Discussion</u>: reaching limits should be clarified; overhead only and right only occasionally


**Consultative Examination Report, Dr. Sabio, 10/11/06 (Tr. 340-46)**
- chief complaints: back injury, shoulder injury, blackout spells, deterioration of spine
- review of systems: complains of dizziness and blackout spells on sudden change of position
- physical exam: well-developed; well-nourished; alert and oriented; stable at station; tenderness and stiffness in right shoulder; no effusion; dorsalis pedis and posterior tibial arteries have strong and symmetrical pulses; muscle development is symmetrical on both sides in upper and lower extremities; spine showed normal spinal curvature; tenderness over spinous processes of thoracic and lumbar spines; no muscle spasm or rigidity
- range of motion:
> - cervical spine allows 60 degrees of flexion, 75 degrees of extension, lateral flexion is 45 degrees bilaterally, and rotation is 80 degrees bilaterally
> - elbow flexion is 150 degrees bilaterally, extension is 0 degrees bilaterally; supination is 80 degrees bilaterally and pronation is 80 degrees bilaterally
> - wrist dorsiflexion is 60 degrees bilaterally; palmar flexion is 70 degrees bilaterally; radial deviation is 20 degrees bilaterally and ulnar deviation is 30 degrees bilaterally
> - all joints of hands allow 90 degrees of flexion and 0 degrees of extension
> - right shoulder allowed 90 degrees of abduction and 90 degrees of forward flexion
> - left shoulder allowed 180 degrees of abduction and 180 degrees of forward flexion - normal
> - straight leg raise is 90 degrees bilaterally
> - lumbar flexion is 70 degrees forward, 20 degrees laterally to either side
> - hips allow 100 degrees of flexion bilaterally, extension is 30 degrees bilaterally, abduction is 40 degrees bilaterally, and adduction is 20 degrees bilaterally
- diagnostic impression: syncopal attacks; degenerative arthritis right shoulder; posttraumatic and chronic back strain
- summary: complains of blackout spells; had CT scan - normal; neurologic exam is unremarkable; fine manipulation movements normal; weakness of right handgrip - probably due to previous injury in right shoulder


**Physical Residual Functional Capacity Assessment, Dr. Lauderman, 11/9/06 (Tr. 347-55)**
- primary diagnosis: back and shoulder pain
- secondary diagnosis: vertigo
<u>Exertional Limitations</u>
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited
<u>Postural Limitations</u>:

- climbing ramp/stairs: frequently
- climbing ladder/rope/scaffold: never
- balancing: frequently
- stooping: frequently
- kneeling: frequently
- crouching: frequently
- crawling: frequently
Manipulative Limitations:
- reaching all directions (including overhead): limited
- handling (gross manipulation): unlimited
- fingering (fine manipulation): unlimited
- feeling (skin receptors): unlimited
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid all exposure
Additional Comments: trouble with personal care; doesn't do yard or house work; reports problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, using hands; partially credible since medical evidence does not substantiate claimant's allegations to degree alleged

**Medical Evaluation/ Case Analysis, Dr. Osborne, 2/16/07 (Tr. 356-66)**
- reviewed all medical evidence in file and assessment of 11/9/06 is affirmed

D.      Testimonial Evidence

        Testimony was taken at the hearing held on April 30, 2009.  The following portions of

the testimony are relevant to the disposition of the case:

        EXAMINATION BY ATTORNEY:

        ATTY        State your name.
        CLMT        Jimmy Parsons.
                              *              *              *
        Q       What's your date of birth?
        A       10/15/78.

16

Q How far did you go in school, Jim?

A Eighth grade.

Q Did you complete that?

A I completed the eighth grade.  I went and later got my GED.

Q All right.  Any problems getting that GED?

A No.

Q Are you right or left-handed?

A I'm right-handed.

Q What's your height?

A 5' 6".

Q And your weight?

A Approximately 140.

Q Has your weight changed since - -

A It's went - -

Q - - 2003, excuse me.

A It's went up and down low as 115 pounds, back up.  I mean, it bounces back and forth.

*   *   *

Q So you had an injury - - what type - - well, first of all, what type of work have you done in the past 15 years?

A Construction, labor mostly.

Q What do you mean by labor construction?

A Building houses.

Q Were you the one - - were you carrying the wood, carrying the shingles?

A Yeah, I carried the lumber, framed.

Q Did you do the drywall or someone else do the drywall?

A I did drywall for a while.

Q Did you do the finishing or did you just - -

A I hung.

Q You just hung it?

A Yeah.

Q Okay.  And you had an injury.

A Yes.

Q What happened?

A We were setting tresses and the tress spun around backwards, had to be reset, and I ended up falling from the first floor or second floor to the first floor.

*   *   *

Q And where did you land?

A I landed on the first floor, landed on my temple and my shoulder.

Q So you went head first basically.

A Yes.  Head first.

Q And this was - - actually, it happened at work, but some reason we don't know if the employer had to work, then wasn't paying into Workers' Comp, but ended up not being a Workers' Comp claim.

A        Correct.

Q        Workers' Comp denied it or - -

A        I've never - -

Q        You have no idea?

A        I've never had no information on that.  I know he went to the doctor's with me, my boss did, and he signed off on it that it did happen at work.  It was an accident at work.

Q        Did you - - did they pay for any of the medical treatment?

A        He did.

\*             \*             \*

Q        And did you end up having surgery on that shoulder?

A        In 2001 I ended up having to have surgery, right shoulder AC reconstruction.  They  took a inch and a half of my collar bone, cut it out, and reattached muscles, ligaments, and whatever else they could replace.

Q        Was it a success?

A        Somewhat.  I've still got pain.  I can't hardly move my arm.  It's just constant.

Q        Did you go through physical therapy?

A        Yes.  I went through physical therapy.  I got some range of motion back.    The pain has never went away.  It's never decreased.  If I move my arm, it gets worse.

Q        Now we're talking about moving arm, does it have to be above your head or can it be different?

A        No, it's any range of motion concerning my shoulder.  If you do anything like lifting a piece of paper you go to move your shoulder and it's not just, you know, over your head.

Q        How about with it sitting?  You even have it kind of guarded when you sit.

A        It's constant - - it constant hurts.  It don't quit.

Q        Your treatment following kind of decreases over the years and you're basically getting treated at what, Minnie Hamilton now?

A        Yes.

Q        And what is Minnie Hamilton?

A        It's basically an emergency room clinic.

Q        Kind of a clinic?

A        Yeah.

Q        They do you on a sliding fee scale or - -

A        Yes, they do a sliding scale fee.

Q        And so you - - do you see the same person or you see whoever's there?

A        Whoever's on call.

Q        It could be a nurse practitioner.  It could be a PA.

A        Correct.

Q        It could be a medical doctor.  You just don't know what you're going to get.

A        No.

Q        They actually prescribed you medicine, but you have, sometimes have a hard time getting that filled.

A        Yeah.  I can't - - I ain't got no insurance, can't afford the medication.

Q        What kind of medication have they prescribed you?

A       Nerve pills, muscle relaxers, pain killers.

Q       Why nerve pills?

A       They said that helps the, ease the pain because the nerves ain't firing correctly.

                    *                    *                    *

Q       Can you describe the pain that you have in your shoulder and then we're going to go to your neck and - -

A       It's like a constant ache, but the muscle tension that builds up, I can't hardly move my neck.  It gets stiff.  I can't move my head and neck, anything.

Q       Is there anything you do that helps relieve the pain?

A       Hot towels, find hot towels works.

Q       How about have you tried a TENS Unit or - -

A       They had me on a TENS Unit for muscle spasms.  That helps.  I mean, it don't get rid of it, but that helps.

Q       You still have that TENS Unit?

A       No.  I don't.  It quit working, fell and broke.

Q       You were using that TENS Unit, what, up to four times a month, or week, or excuse me, you were at four times a day?

A       Four times a day.  Sometimes I'd leave it on all day.

Q       You also went to see Dr. Gold for your back.

A       Yes, ma'am.

Q       And I want to clarify something for the record.  We were only able to get one report from Dr. Gold, and that was from his physician assistant, but you actually saw Dr. Gold at one of your visits, which they said they have misplaced, Dr. Gold's office.

A       Yes.

Q       But what did Dr. Gold tell you?

A       He told me that he wanted to do surgery.  He was going to set it up at Morgantown Hospital.  The West Virginia University Hospital or whatever it was.

Q       Um-hum.

A       And I asked him what he - - what the surgery entailed, and he's talking like 16 hour surgery, taking a titanium cage and putting in my spine with a steel bar to the base of my neck, and only giving me a 20 percent chance of being able to walk after I have the surgery.

Q       That was - - that said it's the only thing he could have done for you.  Is that right?

A       Yes.

Q       And, of course, you decided against that.

A       I refused the surgery.

Q       Can you describe your back pain?

A       It's - - on a scale of 1 to 10 a 7 to 8.  Any movement, getting up and down, standing, steps, it increases it and where you have to lift your leg, that makes it worse.  Just sitting for any length of time, I can hardly get up when I'm done.  There's a lot of things.

Q       Can you describe - - you have neck pain?

A       Yes, ma'am.

Q       Can you describe your neck pain?

A       It stays stiff, tender.

Q       Is it on a certain side or is it both?

A      It's mainly on the right side.

Q      Do you have any problems with range of motion in your neck?

A      I can only turn my neck sometimes you know, if I - -

Q      Can you turn it from side-to-side?

A      With complications, yeah, with more - -

Q      It causes pain?

A      Yes.

Q      There's been some brief mention of these dizziness attacks.

A      Yes, ma'am.

Q      Can you describe that? Did those occur after your injury or - -

A      Those started occurring after an injury and it's when I stand up, just black out, hit the floor. I don't know what it caused from. I went to the doctor. They said 99 percent of the people that pass out never find out what causes it.

Q      Are you still hving those or is that better now?

A      I still get dizzy, but I haven't blacked out in a while.

Q      So that's gotten better since '06?

A      It's gotten somewhat better.

Q      Okay. So the main problem is your, is the pain in your shoulder, and neck, and back.

A      Yes, ma'am.

Q      How long can you stand without having to sit?

A      Ten minutes tops.

Q      How long can you sit without having to change position?

A      Every five, ten minutes I've got to keep moving.

Q      Sitting in your seat, but how long can you sit without having to stand up?

A      Without having to stand up, just like half hour. It depends how the, you know, the seat is.

Q      How much can you lift?

A      I wouldn't have a clue.

Q      Of course, you can lift more with your left than you can with your right.

A      Yes.

Q      Does lifting cause, even on your left, cause a strain on your neck?

A      Yeah.

Q      What's a - - have you lift a bag of groceries?

A      I can lift a bag of groceries like it pulls, you know what I mean? It puts pressure on this side.

Q      You're pointing to your right side there.

A      Yes.

Q      Any problems walking?

A      Doctor said I was walking out of line. I don't know. He used - -

Q      He said you had a abnormal gait.

A      Yeah, a rolling gait. That's what he used, a rolling gait, abnormal.

Q      Why do you think you limp or have a abnormal gait?

A      I didn't have a problem with walking until after I took that, the initial fall. It

started after that.

Q        On a scale of 1 to 10, one being the least amount of pain and 10 being the most amount of pain, how would you rate your pain on a daily basis?

A        If I'm not working or, you know, doing anything strenuous, a 8, 7, 8.  And if I'm, you know, like washing dishes or, you know, moving my arm doing something, anything, you know, it gets worse.  I'd go all the way to 10.

Q        Now if - - could you sit where you are right now and be able to work out in front of you with your shoulder the way it is?

A        Not with my shoulder being - - my arm goes numb.  If I hold my arm out here it goes numb after about three minutes.  If I hold, you know, where it's got pressure against it.

                        *                *                *

BY ADMINISTRATIVE LAW JUDGE:

ALJ          Mr. Parsons, let me just ask a couple of follow-up questions if you don't mind, sir.  It's well developed in the record how you sustained your injury and exactly what has been taking place.  We've filled in the gaps nicely by Ms. Dills explaining why you have not had any treatment or significant treatment for a number of years since that accident, but let me confirm that since the date of your accident in June, June 1 of 2003 to the present, have you worked in any way, shape, or form?

CLMT          No, sir.

                        *                *                *

Q        2003.  Okay.   And what are your sources of income?

A        My wife works at Rite Aid.

Q        And can you tell me a little bit about your average day?  What do you do every day now?

A        I sit around the house with time on your hands.  I watch my kids they get off school.  I can't, you know, do anything.  I can't even get out and mow my yard.

Q        Are you able to help at all with the household chores, laundry, cooking, any of that type of stuff?

A        I try to do the dishes sometimes and don't even, you know, I can't even do all them.

Q        Okay.  Are you able to drive?

A        No, sir.  I have no driver's license.

Q        Okay.  Is that - - have you ever had a driver's license?

A        No, sir.

Q        In looking at Exhibit 17F, the Minnie Hamilton Clinic records, I note that in September of 2007 you had a motorcycle accident.

A        No.  I didn't have a motorcycle accident.  I wrecked a - -

ALJ          An entry on - -

ATTY          Four wheeler.

ALJ          - - 9/10/07 it said you wrecked a motorcycle and you were having some right shoulder pain.

CLMT          That was - -

BY ADMINISTRATIVE LAW JUDGE:

Q        Is that inaccurate?

A        That was a four wheeler. It was - -

Q        Okay.

A        It wasn't a motorcycle. They must misunderstood me.

Q        Understood. So you were able to drive a four wheeler?

A        I was checking it out for my little brother and ended up wrecking it.

Q        Okay. And did that cause any additional problems with your right shoulder?

A        I couldn't move my arm for several days thereafter.

Q        Want to - - I want to ask you about a couple of the entries in Exhibit 8F, which are the records from - - well, I think it's primarily a physician's assistant named Mark Hewitt [phonetic].

They only go up to October of 2003, but in September of 2003 in an entry dated the 10th day of September 2003, it indicates that, specifically, that you've been using mowers, but your arm to be elevated at shoulder height and were having some problems there.

A        Yes, sir.

Q        Then in an entry dated October 2003, I want to say October - - get these in order here. October 1, 2003, you were complaining of some groin pain, especially after being on a riding mower.

A        Yes, sir.

Q        October 3, 2003, shoulder was hurting, but you were able to work full day "yesterday". October 6, 2003, entry noting that you were able to "lift at work". 8, October 2003, that you reported that you fell at work and were a little sore, October 10, 2003, your back was sore today because you were weed eating all day at work. Then October 17, 2003, shoulder better, but low back very aggravated while using a mower. Those are all indications that you were working after your alleged onset date. Can you address those?

A        That was in 2003.

Q        Right.

A        I tried to work for, you know, I couldn't make ends meet. I lost my house that I was living in. I - - my wife couldn't, you know, make ends meet so I went and went back to work against the doctor's orders or whatever to try to get everything took care of.

Q        Okay.

A        And - -

Q        How long did you, were you able to work?

A        I don't think it was even six months. It might have been right at six months.

Q        Okay. Now during that entire time period none of those earnings that you made are reported, so were you working under the table at that time?

A        Sir, I filed taxes in 2003.

Q        And you reported all that income?

A        Yes, sir.

ALJ        Okay. Ms. Dills, you want - - can you supply me with a copy of that tax return?

ATTY        Yes, Your Honor.

                                             *               *               *

ALJ        Okay. And after the completion of that approximate six month period, was there any work whatsoever?

CLMT        No.  I have not worked since then.

ALJ          Okay.  I want to be real clear in asking this.  Was there any work during that entire period since your alleged onset date where income was not reported?

CLMT        No, sir.

ALJ          No under the table earnings of any sort?

CLMT        No, sir.

*          *          *

Q        Let's go back to the blacking out incidents.  When is the last time you had a blacking out incident?

A        Two months ago.

Q        And does that usually occur when you stand up and all of a sudden that you just - -

A        Yes, sir.

Q        - - feel dizzy and black right out?

A        There's no feeling dizzy.  It's - - I just hit the floor.  I don't know anything about it until I wake up.

Q        How often does that occur?

A        In the last five years I'd say seven, eight times.

Q        And to this date you really don't know what causes that?

A        I have no clue.

Q        Any treatment for that at all?

A        They never figured out what it was.  They thought it might be my heart.  I had to wear a heart monitor for 30 days.

*          *          *

Q        Now as you stand today, let me just put you, say, in a Walmart walking around.  How long would you be able to go walk around at Walmart and do shopping?

A        Half hour tops.

Q        Okay.  And would you have any concerns about people having contact with you or your arm?  Would that - -

A        Yes.  I keep my arm very guarded.

Q        Do you ever need to wear a sling or any other device relating to your arm?

A        If it's hurting that bad, yeah, I have a sling at the house.

Q        And how often do you find yourself using the sling?

A        Just if I overwork my arm and it's - - I don't know, once a month.

Q        One of the things you mentioned in your original disability report was that you were dealing with a lot of nerve issues, getting mad, having some violent mood swings.  Can you address that?  Is that still going on?

A        It's ongoing.  I get aggravated sometimes.  I don't know.  The nerve pills helped when I had them, kept me from getting mad.

Q        Okay.  Is that a - - do you think that's a serious issue at all for you or you got that pretty much under control?

A        Well, I mean, I don't know.  I get agitated and I tend to fly off the handle sometimes.

Q        Do you know what causes that?

23

A       No.

                      *          *          *

Q       I do want to clarify, one of the things you dealt with for a while was asthma and are you still dealing with that?

A       Yes, sir.

Q       Can you tell me are you receiving any treatment, using any inhalers?  What - - how do you deal with asthma today?

A       I just don't take flight of steps.  I don't do anything strenuous.  I've got no way to get an inhaler.  They're like $75 with no insurance.  They're like $75 a pop.

Q       Okay.  Are you experiencing any asthma issues or asthma-related attacks?

A       If I do something strenuous, if pollen or, you know, anything like that, yes.  It cuts my breathing down.

                      *          *          *

ALJ       Thank you, Mr. Parsons, I appreciate that and I'm going to turn now to our vocational expert and ask him a few questions if I may.  Good morning, Mr. Tanze.

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       Mr. Tanze, does our Claimant today have past relevant work, and, if so, could you list that for the prior 15 year period?

A       Well, Your Honor, I did an earnings record researching this file and there was no SGA.  If we used that yardstick, no, there was no SGA reported earnings.

Q       Thank you.  Sir, I'd like to pose a hypothetical scenario to you and then ask a few additional questions in follow-up.  I'd like you to assume an individual of our Claimant's age, which is 30, his education, which is that of an eighth grade limited education with GED completion, and his work experience, who is able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and like work as defined by the regulations.  This individual may occasionally reach overhead and in all directions with the dominant right upper extremity.  Occasionally push/pull, handle, and finger with the same extremity.  This individual may frequently climb ramps and stairs, stoop, bend, crouch, kneel, balance, and crawl, but may never climb ladders, ropes, and scaffolds.  This person must avoid concentrated exposure to extreme heat, excuse me, extreme cold, and vibration, and most avoid all exposure to hazards such as moving machinery and heights.  This individual may occasionally engage in rotation and flexion of the neck.  Taking into consideration an individual with those hypothetical limitations, would such an individual be employable in the  -  well, would there be jobs in the national or regional economy such a person so limited?

A       There would, yeah.

Q       Okay.  Can you give me some representative examples?

A       Yes, sir.  Representative examples that would fit the demands of the hypothetical would include [INAUDIBLE].

                      *          *          *

VE       Okay.  All right.  Per the hypothetical representative jobs would include counter worker, 249.365-010, nationally 156,000, in the region as many as 4,000.  Also stock checker, 249.667-014, nationally 200,000, in the region as many as 4,800.  Also a representative example would be price marker, 209.587-034, nationally 124,000, and in the region 9,000.

*          *          *

Q       Thank you very much.  I'd like to now add to that first hypothetical or alter it a bit and I'd like you to assume all the prior limitations stated except that this individual has no use of the dominant right arm and upper extremity.  With that additional limitation built in, would those jobs you listed still exist?

A       No, sir.

Q       Would there be other jobs in the regional or national economy an individual with that limitation could perform?

A       Judge, in my opinion, there would not be.  I know that you'll get differing responses from other vocational experts on that.  In my opinion there would not be however.

Q       Okay.  Now let's go back to hypothetical #1 then and I'd like you to consider that, those limitations with the following additional limitation.  Due to a combination of sever medical impairments and associated pain this individual is unable to engage in sustained work activity for a full eight hour day five days a week, or a 40 hour work week, or equivalent schedule.  With that limitation built in would those other jobs exist?

A       No.  There would be no jobs that I could offer with that addition.

*          *          *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

ATTY        Mr. Tanze, the jobs that you named, how much use in the upper extremity on the dominant hand would, or arm would that require?

VE          All of these would require bilateral occasional reach overhead in all directions, occasional push/pull, handle, and finger bilaterally.

ATTY        Okay.  And how about fine manipulation, what would that require?

VE          All three would require frequent fine manipulation.

ATTY        Okay.  In your - - is that consistent, in your opinion, is that consistent with the Occupational Titles, the occasional upper extremity?

VE          Yes, um-hum, and manipulation as well, yes.

*          *          *

BY ADMINISTRATIVE LAW JUDGE:

Q       Maybe I didn't clarify when I stated, but I did state that this individual may engage in occasional handling and fingering, and you just stated that these jobs involve frequent fine fingering.

A       Fine, these jobs would require fine fingering, yes.

Q       At the frequent level?

A       Frequently, yes, throughout the day, more than half, two-thirds of the time this person - - and all of these jobs that they're dealing with fine manipulation, fine fingering, fine grip.

Q       Okay.  Then would they not be eliminated by an occasional limit bilaterally?

A       Well actually, Judge, fine wasn't in the - - this person could handle and I interpreted your hypothetical of not being precise fingering since that wasn't mentioned.  This, that person in the first hypothetical could handle.  The addition that the attorney made was she brought it down to fine fingering.

Q       Um-hum.

A       Which is somewhat different than the hypo - -

25

Q        Okay, let me just ask you - -

A        Okay.

Q        - - if this individual was limited to only occasional fine fingering, would that change your response?

A        Yes.

Q        And which - - would it eliminate all the jobs you cited?

A        It would eliminate those three jobs, yes, sir.

Q        Would there be other jobs that such a person with that limitation could do?

A        Give me a moment, please.

Q        Sure.

A        Yes, there would be.

Q        Could you give some representative examples of that?

A        Yes.  A retail clerk, 299.077-010, nationally 600,000, in the region that I identified, I identified as many as 11,000.  Router, which is a product handling job actually, 209.667-014, nationally 180,000, in the region as many as 7,000.  Bakery worker, 524.687-022, nationally 160,000, and in the region 5,000.

ALJ        All right , sir.  Thank you.  Apologize if I wasn't clear in that hypothetical.  Ms. Dills, any follow-up to that?

*                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        And basically in all these jobs though, wouldn't it require basically a constant upper extremity use?

A        Oh, yes.  All the jobs I offered with regard to the first hypothetical would require the use of both arms.

*                *                *

BY ADMINISTRATIVE LAW JUDGE:

Q        Ms. Dills makes a good point, which is that this individual, if he's limited to only occasional use of the right dominant extremity, would he be able to perform any job that required constant bilateral use of the upper extremity?

A        Well, Your Honor, the one hypothetical that was given with regard to that with there was no use of the dominant right arm, the extremity, that renders this employee in the eyes of an employer as a one armed individual.

Q        No, I'm talking about hypothetical 1 that limited him to only occasional use of the right dominant - -

A        Um-hum.

Q        - - upper extremity.

A        Uh-huh.

Q        Which is up to a third of the time.

A        Right.

Q        And I'm wondering in a job like router that sounds as though there's a constant bilateral - -

A        Oh, yes.  There is.  Yes, there is.

Q        So how could he do a - -

A        Uh-huh.

26

Q          - - job of that nature?

A          Uh-huh.  Well let's examine, again, how it's stated.  There was occasional reaching overhead, which is good bilaterally, occasional push/pull, and handle, and finger, which is certainly  meets the grid there, or meets that requirement there.  You said occasional rotation, which in the posturals the hypothetical you gave reflects a person that has use of both arms, the first hypothetical going back to the original.

Q          Understood.

A          Now with the addition that she made to that one, then that is no longer a person that can function with both arms.

ALJ          Got it.  Thank you very much.  That's very informative.

*          *          *

E.          <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- can only stand for 10 minutes before needing to sit (Tr. 34)
- can sit for only 30 minutes before needing to stand (Tr. 34)
- tries to help with dishes (Tr. 36)
- looks after children (Tr. 161)
- feeds his dog (Tr. 161)
- has help caring for children and dog from his wife (Tr. 161)
- watches television "all the time" (Tr. 164, 189, 193)
- reads books and magazines (Tr. 189, 193)
- can no longer play sports (Tr. 190)
- can no longer walk and run (Tr. 190)
- needs help putting on his shirts (Tr. 190)
- is unable to brush his hair (Tr. 161, 190)
- needs help shaving (Tr. 161, 190)
- needs reminded to take medication (Tr. 162, 191)
- can no longer cook due to back pain (Tr. 162, 191)
- does not do household chores (Tr. 162, 191)
- goes outside once or twice each day (Tr. 163, 192)
- does not go out by himself because he's afraid of having a black out (Tr. 192)
- does not drive (Tr. 37, 163, 192)
- does not shop (Tr. 163, 192)
- is able to pay bills and count change (Tr. 163, 192)
- is able to handle a savings account and use a checkbook/money order (Tr. 163)
- is not able to handle a savings account or use a checkbook/money order (Tr. 192)
- spends time with others (Tr. 164, 193)

- visits parents twice each month (Tr. 164, 193)
- has problems getting along with others because he gets aggravated very easily (Tr. 165, 194)
- can lift 5 pounds (Tr. 165, 194)
- can walk approximately 1/4 mile (Tr. 194)
- sometimes has trouble following written instructions (Tr. 165, 194)
- follows spoken instructions pretty well unless there are a lot to remember (Tr. 165, 194)
- does not handle stress well (Tr. 166, 195)
- does not like changes (Tr. 166, 195)
- smokes ½ pack cigarettes each day (Tr. 237)

### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant argues that the ALJ erred in finding that Claimant is able to perform light work. Specifically, Claimant argues that the ALJ violated SSR 00-4p by failing to resolve the conflict between the Vocational Expert's ("VE") testimony and the information in the Dictionary of Occupational Titles ("DOT").

Commissioner contends that substantial evidence supports the ALJ's Residual Functional Capacity determination and finding of non-disability.  Additionally, Commissioner argues that the ALJ properly relied on the VE's testimony to determine the existence of work in the economy that Claimant is able to perform.

B.     Discussion

1.  Whether the ALJ Erred in Relying on the VE's testimony

Claimant appears to make three arguments based on the ALJ's RFC determination and the subsequent occupational determinations made by the VE.  First, Claimant argues that the VE failed to include "occasional reaching in all directions" in his reiteration of the hypothetical, which caused the VE to name jobs that Claimant is not able to perform.  Second, Claimant argues that although the ALJ limited Claimant to occasional reaching, pushing and pulling, and

fine manipulation, the VE gave jobs that require 1/3 of the day reaching, 1/3 of the day pushing and pulling, and 1/3 of the day fine manipulating, which equals a full day of using his right upper extremity. Finally, Claimant argues that the jobs listed by the VE conflict with the descriptions in the DOT.

Commissioner contends that the ALJ properly relied on the VE's testimony in determining that Claimant is capable of light work. First, Commissioner argues that the hypothetical posed to the VE did include all of Claimant's limitations. Second, with respect to the occasional reaching, pushing and pulling, and fine manipulation limitation, the Commissioner contends that a difference exists between constant movement of some kind throughout the day and a limit of occasional movement with respect to specific areas. Further, the Commissioner argues that the ALJ did not limit the Claimant with respect to total motion. Finally, the Commissioner concedes that the requirements of a retail clerk and router exceed Claimant's capabilities; however, Commissioner argues that the requirements of a bakery work are consistent with the RFC and the VE's testimony.

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). The Residual Functional Capacity assessment is based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities.

Id.  The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact.  20 C.F.R. § 416.946.

The Fourth Circuit Court of Appeals has held, albeit in an unpublished opinion, that while questions posed to the VE must fairly set out all of a claimant's impairments, the question need only reflect those impairments supported by the record.  Russell v. Barnhart, 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003).[5]  The Court further stated that the hypothetical question may omit non-severe impairments, but must include those that the ALJ finds to be severe.  Id.  Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though those considerations are more restrictive than those suggested by the ALJ."  France v. Apfel, 87 F.Supp.2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1986)).

The ALJ is afforded "great latitude in posing hypothetical questions."  Koonce v. Apfel, 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999)[6] (citing Martinez, 807 F.2d at 774).  The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the Claimant's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

Hammond v. Apfel, 5 Fed. Appx. 101, 105; 2001 WL 87460, at 4 (4th Cir. 2001).[7]

Here, the ALJ posed the following hypothetical question to the VE:

I'd like you to assume an individual of our Claimant's age, which is 30, his education, which is that of an eighth grade limited education with GED completion, and his work experience, who is able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and light work as defined by the regulations. This individual may occasionally reach overhead and in all directions with the dominant right upper extremity. Occasionally push/pull, handle, and finger with the same extremity. This individual may frequently climb ramps and stairs, stoop, bend, crouch, kneel, balance, and crawl, but may never climb ladders, ropes, and scaffolds. This person must avoid concentrated exposure to extreme heat, excuse me, extreme cold, and vibration, and must avoid all exposure to hazards such as moving machinery and heights. This individual may occasionally engage in rotation and flexion of the neck. Taking into consideration an individual with those hypothetical limitations, would such an individual be employable in the – well, would there be jobs in the national or regional economy such a person so limited?

(Tr. 44-45). To this, the VE listed possible employment as counter work, stock checker, and price marker. (Tr. 45). The ALJ then asked the VE to "assume all the prior limitations stated except that this individual has no use of the dominant right arm and upper extremity" and determine whether jobs would exist for that hypothetical individual. (Tr. 46). The VE responded negatively. The ALJ then asked the VE to consider the same limitations as first given but that the individual is also "unable to engage in sustained work activity for a full eight hour day five days a week, or a 40 hour work week, or equivalent schedule." (Id.). Again, the VE responded negatively.

Claimant's counsel and the ALJ then questioned the movements required in the first hypothetical. (Tr. 47). The VE responded that all jobs named in response to the first

[7] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

hypothetical would require bilateral occasional reach overhead in all directions, occasional push/pull, handle, and finger bilaterally and frequent fine manipulation. (Id.). The VE also responded that the testimony is consistent with the Dictionary of Occupational Titles. (Id.). Subsequently, and in further effort to clarify, the ALJ inquired into the level of finger manipulation required by the job. (Tr. 48). The VE responded that he "interpreted [the ALJ's] hypothetical of not being precise fingering since that wasn't mentioned" and that if the hypothetical individual was limited to only occasional fine fingering the three previous jobs would be eliminated. (Tr. 48-49). However, according to the VE, if the occasional fine fingering limitation were added, the hypothetical person would be able to work as a retail clerk, router, and bakery worker. (Tr. 49).

Claimant seems to confuse the testimony and order of questioning when arguing that the VE failed to name the restriction of occasional reaching overhead an in all directions in his reiteration of the hypothetical. The first hypothetical included a limitation of "occasionally reach overhead and in all directions with the dominant right upper extremity." (Tr. 44). Each variation given by the ALJ and Claimant's counsel included the same original restrictions and limitations and added various aspects (i.e., "no use of dominant right arm and upper extremity;" "unable to engage in sustained work activity for a full eight hour day five days a week;" and "occasional fine fingering"). Therefore, the ALJ did not err by failing to include "occasional reaching in all directions" in the hypothetical. Accordingly, Claimant's first argument that the ALJ failed to include all limitations is without merit.

Second, and also based on the complicated exchange, Claimant argues that the ALJ erred in finding Claimant is able to perform the jobs of retail clerk, router, and bakery worker because

the VE chose these jobs based on the ALJ's determination that Claimant is capable of occasional reaching, pushing and pulling, and fine manipulation and the listed jobs exceed Claimant's occasional restrictions. The ALJ did limit Claimant's reaching, pushing/pulling, handling, and fine manipulation to occasional; however, as Commissioner contends, the ALJ did not limit Claimant with respect to total motion. Claimant is limited to occasional reaching, occasional pushing/pulling, occasional handling, and occasional fine manipulation. Though taking the occasional movements together equals constant movement, Claimant was not restricted from constant movement. He was only limited to performing each of the movements occasionally. (Tr. 44). A claimant's RFC is reserved for the ALJ. Therefore, it is not in the province of the Court to find that the job requirements exceed Claimant's capabilities. Accordingly, Claimant's second argument must also fail.

Finally, Claimant argues that the jobs listed by the VE conflict with the descriptions in the DOT and the ALJ erred by failing to obtain a reasonable explanation for the apparent conflict as required by SSR 00-4p. Ruling 00-4p clarifies the standards for use of vocational experts who provide evidence at hearings before the presiding administrative law judge. SSR 00-4p, 2000 WL 1898704, at 1 (S.S.A.). The "ruling emphasizes that before relying on VE . . . evidence to support a disability determination or decision, our adjudicators must: identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles . . . ." Id. The ALJ has an affirmative duty to ask about any possible conflict between the VE testimony and the information provided in the DOT. Id. at 4. The adjudicator must ask if the evidence provided conflicts with the DOT information and obtain a reasonable explanation for any conflict. Id. When there is an apparent

conflict, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE's evidence and testimony to support a disability determination. Id. at 2.

Ruling 00-4p is satisfied "'by the ALJ simply asking the VE if his testimony is consistent with the DOT.'" Street v. Commissioner of Social Sec., 2010 WL 13476205, at 5 (E.D. Mich. 2010) (citing Martin v. Comm'r of Social Sec., 170 Fed.Appx. 369, 374-75 (6th Cir. 2006)). If the ALJ asks the VE if a conflict exists and the ALJ denies, the ALJ's duty ends. Martin, 170 Fed.Appx. at 374; see also, Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (stating that "SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent'") . The claimant may bring the VE's mistake to the ALJ's attention, but "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." Id. (finding that "[b]ecause [the claimant] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved. Here, the ALJ asked if there was a conflict and the uncontradicted testimony of the vocational expert indicated that no conflict existed").

Here, the ALJ specifically asked whether the ALJ's testimony was consistent with the DOT. (Tr. 47). The VE responded that it was. (Id.). Because the ALJ responded affirmatively, no further inquiry was required by the ALJ under SSR 00-4p. Moreover, Claimant did not bring any mistake to the ALJ's attention. A long discussion regarding the given occupations and Claimant's capacity to perform the duties ensued; however, the record indicates that the discussion was resolved favorably. Upon the ALJ's listing of the three new occupations once the occasional fine manipulation limitation was added, Claimant's attorney and the ALJ both

inquired into Claimant's capability of performing the jobs, which required constant manipulation.[8]   The ALJ asks how Claimant can do a job "like router that sounds as though there's a constant bilateral" movement.  (Tr. 51).  Though the record is not completely clear as to whether the VE is referring to the DOT, the record indicates that the VE compared the hypothetical given to the requirements of the router and determined that the requirements met the limitations in the hypothetical.  (Id.).  Neither the ALJ nor Claimant objected to this finding. Accordingly, the ALJ complied with the requirements of SSR 00-4p, and Claimant's argument must fail.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err in relying on the VE's testimony, did not violate SSR 00-4p, and properly formed the RFC including Claimant's limitations.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be

---

[8] As fully explained *supra*, the ALJ did not limit Claimant with respect to total manipulation.

submitted to the District Court Judge of Record.  Failure to timely file objections to the Report

and Recommendation set forth above will result in waiver of the right to appeal from a judgment

of this Court based upon such Report and Recommendation.

DATED:  May 18, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE